RECEIVED

MAY 11 2026

U.S. DISTRICT COURT
BRIDGEPORT, CT

MAY 11 2026 PM2:09
FILED - USDC - BPT - CT

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

ZACKARY SANDERS,                )
                                )
        Plaintiff,              )
                                )
V.                              )           Case No._____
                                )
P. CRAMPTON (CO),               )
DITZION (LT),                   )
PUZIO (AW),                     )
C. FLOWERS (Warden),            )
JOHN DOES (Danbury Staff),      )
FCI DANBURY,                    )
BUREAU OF PRISONS,              )
                                )
        Defendants.             )

## EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER (TRO) AND PRELIMINARY INJUNCTIVE RELIEF

Zackary Sanders, pro se, hereinafter Plaintiff, respectfully files this Emergency Motion for Temporary Restraining Order (TRO) and Preliminary Injunctive Relief to enjoin defendants from taking imminent adverse actions against Plaintiff for exercising his First Amendment rights, cease defendants' infliction of corporal punishment against Plaintiff for exercising his First Amendment rights, enjoin defendants from taking threatened action on Plaintiff's future speech, and enjoin defendants from tampering with and censoring Plaintiff's outgoing communications in violation of the Code of Federal Regulations.

## LEGAL STANDARD

Under Rule 65(b) of the Federal Rules of Civil Procedure, a TRO may be granted without a hearing when immediate relief is necessary to prevent irreparable harm. Because Plaintiff proceeds pro se, the Court should construe the TRO liberally, and hold it to a less stringent standard than papers filed by attorneys. Haines v. Kerner, 404 U.S. 519, 520 (1972). The primary purpose of preliminary injunctive relief is "maintenance of the status quo until a decision on the merits of a case is rendered." Acierno v. New Castle Cty., 40 F.3d 645, 647 (3d Cir. 1994).[1] In order to

---

[1] Plaintiff has to primarily rely on 3rd Cir. caselaw in this motion as Danbury's electronic law library is currently down and inaccessible while drafting this motion.

obtain a TRO, the moving party must show:

> (1) a reasonable probability of eventual success in the litigation, and (2) that it will be irreparably injured . . . if relief is not granted . . . . [In addition,] the district court, in considering whether to grant a preliminary injunction, should take into account, when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest.

Reilly v. Cnty. of Harrisburg, 858 F.3d 173, 176 (3d Cir. 2017)(quoting Del. River Auth. v. Transamerican Trailer Transp., Inc., 501 F.2d 917, 919-20 (3d Cir. 1974)). The movant bears the burden of establishing "the threshold for the first two 'most critical' factors . . . . If these gateway factors are met, a court then considers the remaining two factors and determines in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." Id. at 179.

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331; Corr. Servs. Corp. v. Malesko, 534 U.S. 61, 74 (2001). This motion should also be construed as a claim under any other viable statute, to include the APA.

"To state a claim for retaliation, a prisoner must allege that: (1) he was engaged in constitutionally protected conduct, (2) he suffered some 'adverse action at the hands of prison officials,' and (3) "his constitutionally protected conduct was 'a substantial or motivating factor in the decision' to take that action." Wisniewski v. Fisher, 857 F.3d 152, 156 (3d Cir. 2017)(quoting Rauser v. Horn, 241 F.3d 330, 333 (3d Cir. 2001)). It is "settled law that an inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner". Waterman v. Farmer, 183 F.3d 208, 213 (3d Cir. 1999)(internal citations omitted). It is clearly established that prison authorities can not punish an inmate for communications he has with outsiders even if prison authorities consider those communications as defamatory. Procunier v. Martinez, 416 U.S. 396, 419 (1974).[2]

---

[2] Although the Supreme Court has limited the scope of Martinez in subsequent cases such as Turner v. Safley, 482 U.S. 78 (1987) and Thornburgh v. Abbott, 490 U.S. 401, (1989), these limitations only relate to the standard of review and do not effect Martinez as it relates to outgoing communications.

Interpreting Martinez, several other courts have also held that prison officials may not discipline an inmate for defamatory or factually inaccurate statements about prison officials to third-parties. In McNamara v. Moody, 606 F.2d 621, 624 (5th Cir. 1979), the court stated:

> Even if [the prisoner's communication] is libelous, [Procunier v.] Martinez, 416 U.S. 396, 415-16 (1974) indicates that letters may not be suppressed simply because they are 'defamatory'. Here again there must be some relation to a substantial government interest, and the [defendant] has advanced no such interest here. If the warden's purpose is to prevent strongly worded and exaggerated criticism of prison officials from reaching the public, this is precisely the sort of purpose ruled impermissible by Martinez.

In Ross v. Reed, 719 F.2d 689, 695 (4th Cir. 1983) the Fourth Circuit used McNamara to support the proposition that "a prison guard who engaged in censorship was held not entitled to qualified immunity." See also Brooks v. Andolina, 826 F.2d 1266, 1268 (3d Cir. 1987). Bressman v. Farrier, 825 F. Supp. 231, 233 (N.D. Iowa 1993)(quoting Travis v. Norris, 805 F.2d 806, 808 (8th Cir. 1986)("It is well-established in the Eighth Circuit and elsewhere that prison officials 'may not censor inmate correspondence simply to eliminate unflattering or unwelcome opinions or factually incorrect statements.'"); Osterback v. Ingram, No. 3:96-cv-580, 1999 U.S. Dist. LEXIS 20944 at *13-30 (N.D. Fla. Oct. 25, 1999)(concluding that suppression of an inmate's letters was violative of the First Amendment and defendants were not entitled to qualified immunity when the letters were addressed to a former inmate and read "that mailroom bitch . . . Freida, that's her name . . . Freida the Fascist . . ."; "Nazi ultraconservative bastards"). "There is no difference between an outgoing letter and a telephone call with an individual outside the prison. A phone conversation is for all relevant purposes the same as 'correspondence'." Basham v. McBride, 2008 U.S. Dist. LEXIS 49347 (S.D. W.V. June 26, 2008).

## FACTUAL BACKGROUND

On May 3rd, 2026, a BOP staff member with known interpersonal issues – Patrick

Crampton[3] – had several uncontrolled outbursts while working in the FCI Danbury visiting room as the "Visiting 2" officer (this is the secondary position, with the primary officer being "Visiting 1"). These outbursts included exclaiming he was going to have a visitor's car windows smashed, and screaming a visit was over due to the room being full – when there were numerous empty seats, nobody waiting for a seat, and the Visiting 1 officer having stated it should not be terminated. Defendant Crampton engaged in numerous violations of BOP policy, federal law, and the Code of Federal Regulations, and Plaintiff asked for a Lieutenant to be called which Crampton refused. Crampton then shouted at Plaintiff to leave while physically blocking his ability to do so. Plaintiff was eventually able to go, and the Visiting 1 officer apologized to Plaintiff and Plaintiff's visitor for Crampton's behavior. Plaintiff's visitor – a female approximately 70 years old with serious medical issues – left in tears after Defendant's hostilities. Plaintiff found and spoke to the Lieutenant on duty, who stated: "well, It's Crampton, you know how he is". Plaintiff then placed a phone call to his family member visitor, and during the call Plaintiff and his family member discussed Crampton's egregious conduct, Plaintiff made negative comments about Crampton, and stated he would be reporting him to the warden and associate warden the following day. Plaintiff and his family member also had a second call later that day of a similar nature. That evening Crampton worked overtime in Plaintiff's unit during which point Crampton did not conduct numerous required rounds, leaving the unit completely unattended for an hour and a half, and leaving the lights on about 40 minutes after they were supposed to be shut off. When Crampton finally came through the unit Plaintiff looked at his watch and then at the lights at which point Crampton glared at Plaintiff. Crampton then went to an office and specifically looked up and listened to a recording of Plaintiff's calls to his family member and proceeded to write numerous incident reports for the comments Plaintiff made in his outgoing communications – clearly protected conduct. Crampton

---

[3] Plaintiff is unsure of Crampton's specific diagnosis, but understands it to be Autism Spectrum Disorder (ASD).

further tried to have Plaintiff put into the SHU (solitary confinement) to prevent Plaintiff from being able to access the warden and associate warden (AW) to lodge a complaint, which staff refused to authorize. While staff were quick to laugh about the comments Plaintiff made in his outgoing communications – and even vocalize their own disdain for Crampton – they nonetheless refused to dismiss the incident reports stating that it is their understanding that inmates cannot express any negative commentary about staff and warned Plaintiff that staff can discipline Plaintiff for any outgoing communication about them, and that Plaintiff better "watch" and "be careful" about what views he expresses to his family – a blatant violation of his First Amendment rights. One of the two incident reports reads as follows:

> Incident: 312 –– BEING INSOLENT TO STAFF MEMBER.
> On 5/3/2026 at approximately 2300 hours I was monitoring inmate telephone calls utilizing the TRUFONE inmate telephone system made on the account of Sanders #94249-083. This telephone call was made on 5/3/2026 at 2033 hours. At approximately the 6 minute 30 second mark of the telephone call Sanders states, "Did you notice how that moron's face was inflated today." I immediately knew that Sanders was talking about me . . . I perceived this statement to be insolence directed towards me.
> Typed Name/Signature of Reporting Employee: P Crampton
> Incident Report Delivered to Above Inmate By: Ditzion

For the above incident report, Lieutenant Ditzion chose not to dismiss the charge, and instead sanctioned Plaintiff to physical punishment. Even though Plaintiff has numerous documented serious health issues – to include, but not limited to, degenerative disc disease and multiple sclerosis – which are noted in all applicable BOP systems (BEMR, MDS, SENTRY) with relevant work restrictions, Ditzion is currently forcing Plaintiff to stand for hours bent over touching the ground picking individual dandelions out of grass strewn with excrement from Highly Pathogenic Avian Influenza (HPAI)/H5N1-infected geese with his bare hands. Plaintiff is in severe pain from being subjected to this, and spoke to AW Puzio about the matter who stated he would "look into it" but seemed indifferent and has not stopped the illegal treatment. Plaintiff is also facing an imminent hearing with the Disciplinary Hearing Officer (DHO) on the other retaliatory incident report from

defendant Crampton, and investigated and served by defendant Ditzion. This incident report reads substantially similar to the first, with Crampton stating: "At approximately the 4 minute 35 second mark of the telephone call Sanders refers to me as an 'unstable little man.' I perceived all of these statements to be insolence directed towards me." This incident report, however, included a second charge – one that truly defies belief. Crampton alleged a "threat" was made for Plaintiff stating he was going to report Crampton to the warden and AW the following day and get him in trouble for his numerous violations of policy. But a "threat" of getting someone in trouble is not a BOP prohibited act, so Crampton either due to his disability, or as a brazen attempt to violate Plaintiff's civil rights writes that "I perceived this statement to be a direct threat against me that could potentially result in bodily harm towards me". While perhaps technically true that anything "could potentially result" in anything, any rational user of the english language would not leap to such a fantastical conclusion. What is evident is what this was – an attempt to silence Plaintiff. A threat against a staff member typically triggers an immediate investigation and the inmate being placed in the SHU (and often losing all of their belongings and means of communication). Crampton wanted Plaintiff to be unable to access the warden, AW, and other relevant parties. The fact staff did not take those typical actions speaks volumes – everyone is acutely aware the allegation is nonsensical. Unfortunately though, Plaintiff could still face severe sanctions from this incident report which is imminent.

Additionally, separately and aside from the issue with defendant Crampton, after exposing significant financial improprieties at FCI Danbury, staff began opening and withholding/destroying Plaintiff's outgoing mail in violation of the Code of Federal Regulations and the applicable BOP Program Statements. Pursuant to the Code of Federal Regulations, 28 C.F.R. § 540.14(c)(1) mail from an inmate in a minimum or low security institution is to "be sealed by the inmate" and is to be "sent out unopened and uninspected." The same is codified in Program Statement 5265.14,

Correspondence, chapter 6. Mail is also supposed to be sent out within 24 hours. Plaintiff's right to communicate with his family and friends is being severely impacted, both by the disappearance of Plaintiff's outgoing mail, and the fact his speech is being chilled due to the constant threat of staff's retaliation after their prohibited opening and reading of his outgoing mail. This is also affecting his access to the courts as he has an ongoing 2255 proceeding, and the missing and delayed mail includes correspondence relating to that matter.

ARGUMENT

I. Plaintiff Is Likely To Succeed on the Merits

Plaintiff challenges the actions of all defendants under the Constitution, and the mail tampering under both the Constitution and the Administrative Procedure Act (APA). As explained below, Plaintiff is likely to succeed on the merits of these claims – defendants' retaliation, restriction, and infringement of Plaintiff's First Amendment rights are unconstitutional and patently unlawful.

A. Defendants are Engaging in Unconstitutional Retaliation

1. Constitutionally Protected Conduct

Although prisoners' constitutional rights are "necessarily limited," it is "settled law that an inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." Waterman v. Farmer, 183 F.3d 208, 213 (3d Cir. 1999)(internal citations omitted). In Procunier v. Martinez, 416 U.S. 396, 419 (1974) the Supreme Court included defamatory comments among the types of speech prison officials could not regulate in outgoing communications. Id. at 415-16. It is also well-settled that filing a grievance is constitutionally protected activity. See Davis v. Goord, 320 F.3d 346, 352-53 (2nd Cir. 2003). As such, Plaintiff engaged in constitutionally protected conduct.

2. Adverse Action

A prisoner-plaintiff satisfies this requirement by demonstrating that the adverse

-7-

action "was sufficient to deter a person of ordinary firmness from exercising his [constitutional] rights." Allah v. Seiverling, 229 F.3d 220, 225 (3d Cir. 2000)(citing Thaddeus-X v. Blatter, 175 F.3d 378, 398 (6th Cir. 1999)). In thaddeus-X, the court "emphasize[d] that while certain threats or deprivations are so de minimis that they do not rise to the level of being constitutional violations, this threshold is intended to weed out only inconsequential actions." 175 F.3d at 398. "[T]he mere threat of harm can be an adverse action, regardless of whether it is carried out because the threat itself can have a chilling effect." Brodheim v. Cry, 584 F.3d 1262, 1270 (9th Cir. 2009). In other words, "the power of a threat lies not in any negative actions eventually taken, but in the apprehension it creates in the recipient of the threat." Id. at 1271. Manual labor, a threat of a transfer, solitary confinement, and loss of phone and/or visiting clearly would deter a person of ordinary firmness from engaging in protected conduct. This element has been met.

3. Causal Link

Finally, Plaintiff must show a causal link between the action and the exercise of his constitutional rights. A plaintiff can establish the third element of a prima facie case of retaliation by showing an unusually suggestive temporal proximity between the protected activity and the retaliatory action. Watson v. Rozum, 834 F.3d 417, 424 (3d Cir. 2016). Causation can be established from the evidence "gleaned from the record as a whole." Id. (citing Farrell v. Planters Lifesavers Co., 206 F.3d 271, 281 (3d Cir. 2000)). No case can be as clear an example as the instant matter, as defendant quite literally says the adverse action is due to Plaintiff's protected speech. Therefore, Plaintiff has demonstrated a likelihood to prevail on the marits of his TRO.

B. Defendants are Violating the APA and First Amendment in Regards to Mail

1. Violations of the APA

An agency must follow its own rules and regulations. See Accardi v. Shaughnessy, 347 U.S. 260, 265-66 (1954). That includes "procedural rules that limit otherwise

discretionary actions." Steenholdt v. FAA, 314 F.3d 633, 639 (D.C. Cir. 2003). A court may enforce these rules against an agency when "they impose binding norms." Damus v. Nielsen, 313 F. Supp.3d 317, 336 (D.D.C. 2018). Both BOP Program Statement 5265.14 (Correspondence) and the Code of Federal Regulations 28 C.F.R. § 540.14 clearly state that "Outgoing mail from a sentenced inmate in a minimum or low security institutiuon may be sealed by the inmate and, except as provided for in paragraphs (c)(1)(i) through (iv) of this section, is sent out unopened and uninspected." None of Plaintiff's mail falls under any of the codified exemptions from being send out unopened and uninspected. In fact, staff explicitly are claiming the mail tampering is not for any of the listed reasons. Under the APA, an agency cannot "depart from a prior policy sub silentio or simply disregard rules that are still on the books." FCC v. Fox Television Stations, Inc., 556 U.S. 502, 515 (2009).

2. Unconstitutional Retaliation

Plaintiff's outgoing mail was not previously opened, delayed, lost, or destroyed until Plaintiff filed complaints against Danbury and identified specific staff believed to be engaged in misappropriation of funds, embezzlement, waste, fraud, and abuse. After this, Plaintiff's outgoing mail stopped arriving. Upon Plaintiff and his family filing a complaint with the executive assistant, several leters arrived ripped open and with postmarks right after the executive assistant was contacted. Plaintiff filed an administrative remedy and for a short time mail was sent properly. When Plaintiff proceeded to the next level of the administrative remedy and informed staff he would need to file a lawsuit, the mail tampering resumed and staff have taken Plaintiff's outgoing mail and not sent it. Other similarly situated inmates are not having their mail opened, nor is it being delayed or destroyed. It is clear an inmate maintians a First Amendment right to send mail, it is clear mail being withheld/ripped/destroyed is an adverse action, and there is a direct causal link. It cannot be disputed the mail tampering is designed to silence Plaintiff. Even more blatant is the fact that many of the "missing" pieces of mail are the mailings that contain records of violations of policies at Danbury and legal work.

## II.   Irreparable Harm Absent Relief

Plaintiff must show that he is "more likely than not to suffer irreparable harm absent the relief requested." Jose M. C. v. Tsoukaris, 467 F. Supp. 3d 213, 226 (D.N.J. 2020)(internal quotations omitted). The "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." Elrod v. Burns, 427 U.S. 347, 373 (1976). It is clear from the record that Plaintiff's First Amendment rights were violated, which alone suffices to show irreparable harm. Abu-Jamal v. Price, 154 F.3d 128, 136 (3d Cir. 1998)(citing Elrod, 427 U.S. at 373).

## III.   Balance of Equities and the Public Interest Both Favor Movant

The district court must take into account the possibility of harm to other interested persons from granting or denying the requested injunction, and the public interest. McGillvary v. Scutari, No. 23-22605, 2024 WL 3759729, at *6 (D.N.J. Aug 12, 2024)(citing Oburn v. Shapp, 521 F.2d 142, 152 (3d Cir. 1975)). "The public interest will almost always favor the plaintiff, if the plaintiff demonstrates both a likelihood of success on the merits and irreparable injury." Tillery v. Hayman, No. 07-2662, 2028 WL 5416392, at *3 (D.N.J. Dec. 22, 2008)(citing AT&T, 42 F.3d at 1427 n.8). In cases against the government, the balance of equities and the public interest merge. See Pursuing Am.'s Greatness v. FEC, 831 F.3d 500, 511 (D.C. Cir. 2016). When the government violates a law and subjects a plaintiff to irreparable harm, the equities and public interest weigh in plaintiff's favor – "the Government cannot suffer harm from an injunction that merely ends an unlawful practice," C.G.B. v. Wolf, 464 F. Supp. 3d 174, 218 (D.D.C. 2020)(citation modified), and "[i]t is always in the public interest to prevent the violation of a party's constitutional rights," Simms v. District of Colombia, 872 F. Supp. 2d 90, 105 (D.D.C. 2012)(citation modified); see also Melendres v. Arpaio, 695 F.3d 990, 1002 (9th Cir. 2012)(same).

RELIEF REQUESTED

As defendants are already subjecting Plaintiff to illegal retaliatory sanctions for exercising his First Amendment rights, and plan to imminently hold a hearing to institute further deprivations, at TRO and injunctive relief is necessary. Further, multiple staff members have informed plaintiff to "watch out" and that both Crampton and unknown staff are going to attempt to write additional incident reports against Plaintiff in retaliation for his outgoing comments about staff. Time is of the essence as "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." Elrod v. Burns, 427 U.S. 347, 373 (1976). When a deprivation of First Amendment rights is at stake, a plaintiff need not wait for the damage to occur before filing suit. Susan B. Anthony List v. Driehaus, 573 U.S. 149, 158, 134 S. Ct. 2334, 189 L. Ed. 2d 246 (2014). Yet here, the damage has already begun. Further, as defendants have vowed to continue penalizing and retaliating against Plaintiff for his outgoing protected speech, this matter is urgent. Plaintiff seeks a TRO and injunctive relief to restrain defendants from conducting any hearings and instituting any sanctions on incident report numbers 4298152 and 4298154, immediately cease the extra duty and physical punishment already instituted on 4298154, restrain defendants from taking any future disciplinary actions based on comments in outgoing calls/letters, restrain defendants from transferring Plaintiff, changing Plaintiff's housing assignment, or terminating Plaintiff's visits, and restrain defendants from opening and withholding Plaintiff's outgoing mail and ensure it is processed and delivered to the post office within 24 hours as per policy. Defendants should also be restrained from unduly delaying Plaintiff's incoming mail. Plaintiff also requests that the Order note that any disciplinary actions taken by defendants between the date of this filing (May 7th, 2026), and this Court's forthcoming order be suspended pending the outcome of this case.

CONCLUSION

Plaintiff respectfully requests that this Court grant the Motion, enjoining all defendants from taking any actions on incident reports 4298152 and 4298154 (other than to expunge and/or dismiss them), enjoin defendants from enforcing already-imposed sanctions on incident report 4298154, restrain defendants from taking any future actions based on Plaintiff's speech in outgoing calls/letters, restrain defendants from taking further retaliatory adverse actions against Plaintiff such as transferring him, changing his housing assignment, or terminating his visits, and restrain defendants from opening and/or withholding Plaintiff's outgoing mail – ensuring it is processed within 24 hours as per policy.

Dated: 5/7/26

Respectfully Submitted,

Zackary E. Sanders
94249-083
FCI Danbury
33 ½ Pembroke Rd.
Danbury, CT. 06811

Complaint Verification

I, Zackary Sanders, on this 7th day of May, 2026, hereby verify under the penalty of perjury that all of the facts and claims contained in the foregoing motion are true and correct to the best of my knowledge.

Dated: 5/7/26

Zackary E. Sanders
94249-083
FCI Danbury
33 ½ Pembroke Rd.
Danbury, CT. 06811

-12-

Certificate of Service

I hereby certify that on this 7th day of May, 2026, a true and accurate copy of the foregoing motion was mailed to the Clerk of the Court for the District of Connecticut, at 915 Lafayette Blvd. Bridgeport, Ct., 06604, via USPS First Class Mail, postage pre-paid, pursuant to the prison mailbox rule.

Dated: 5/7/26

Zack Sanders

Zackary E. Sanders
94249-083
FCI Danbury
33 ½ Pembroke Rd.
Danbury, CT. 06811

-13-

ZACKARY SANDERS
94249-083
FCI DANBURY
33 1/2 PEMBROKE RD
DANBURY, CT 06811



Clerk of
U.S. Distri
915 Lafa

Bridgeport